## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-DP-00059-SCT

*EARL WESLEY BERRY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/25/92 |
| TRIAL JUDGE: | HON. R. KENNETH COLEMAN |
| COURT FROM WHICH APPEALED: | CHICKASAW COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DAVID O. BELL |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | LAWRENCE L. LITTLE |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | REMANDED TO THE CIRCUIT COURT TO CONDUCT A BATSON HEARING; AFFIRMED ALL REMAINING ISSUES - 11/20/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/11/97 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

### Part One:

¶1. On March 1, 1988, the Chickasaw County grand jury indicted Earl Wesley Berry for the kidnapping and murder of Mary Bounds in violation of Miss. Code Ann. § 97-3-19(2)(e). Berry was also charged with being an habitual offender in violation of Miss. Code Ann. § 99-19-81. He was tried and found guilty of capital murder and sentenced to death. On appeal, this Court affirmed the jury's verdict of guilty but vacated the death sentence and remanded for a new sentencing trial. ***Berry v. State***, 575 So. 2d 1 (Miss. 1990), ***cert. denied***, 500 U.S. 928 (1991) (***Berry I***).

¶2. The second sentencing trial commenced on February 17, 1992, in the Circuit Court of Chickasaw County; however, due to the nature and extent of pretrial publicity, a jury could not be empaneled.

By order of the trial judge, venue was changed to the Circuit Court of Union County on March 17, 1992. The resentencing trial began on June 22, 1992, and on June 25, 1992, the jury again returned a sentence of death. The trial court denied Berry's motion for a new trial and judgment notwithstanding the verdict on December 21, 1992. Aggrieved with the jury's sentence, Berry filed his appeal to this Court assigning eighteen separate errors for our review. In this portion of the court's opinion we discuss the following issues which have been re-numbered for the sake of convenience.

**I. LEGISLATIVE MANDATE AS TO WHAT FACTORS JUSTIFY IMPOSITION OF DEATH SENTENCE FLOUTED WHEN ARBITRARY FACTORS WERE RELIED ON TO ADVOCATE DEATH, VIOLATING BERRY'S RIGHTS UNDER STATE LAW AND EIGHTH AMENDMENT TO U.S. CONSTITUTION.**

**II. ADMISSION OF UNRELIABLE AND IRRELEVANT EVIDENCE VIOLATED BERRY'S RIGHT TO A FAIR TRIAL.**

**III. EIGHTH AND FOURTEENTH AMENDMENTS TO U.S. CONSTITUTION AND ARTICLE 3, § 28 OF STATE CONSTITUTION PROHIBIT IMPOSITION OF DEATH PENALTY WHERE SYSTEM PERMITS THIS UNIQUE PENALTY TO BE APPLIED IN A WANTON AND FREAKISH MANNER.**

**IV. PROSECUTORIAL MISCONDUCT IN TRIAL OF THIS CASE VIOLATED BERRY'S RIGHTS UNDER FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO U.S. CONSTITUTION AND ARTICLE 3, §§ 14, 26, AND 28 OF STATE CONSTITUTION OF 1890.**

**V. AGGRAVATING CIRCUMSTANCE "THAT THE CAPITAL OFFENSE WAS ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL" WAS SUBMITTED TO JURY IN MANNER VIOLATIVE OF STATE LAW AND EIGHTH AND FOURTEENTH AMENDMENTS TO U.S. CONSTITUTION.**

**VI. SUBMISSION OF "MURDER IN THE COURSE OF A KIDNAPING" OR "FELONY MURDER" AGGRAVATING CIRCUMSTANCE VIOLATED STATE LAW, STATE CONSTITUTIONAL PROHIBITION AGAINST DOUBLE JEOPARDY, AND FEDERAL CONSTITUTIONAL PROHIBITIONS AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT.**

**VII. ERROR IN LIMITING CONSIDERATION OF MENTAL CAPACITY TO "SUBSTANTIAL IMPAIRMENT" AND IN DENYING REQUESTED CHARGE ON STATUTORY MITIGATING CIRCUMSTANCE OF "MENTAL OR EMOTIONAL DISTURBANCE."**

**VIII. ERROR IN REFUSING TO GIVE PEREMPTORY INSTRUCTIONS ON UNDISPUTED MITIGATING CIRCUMSTANCES.**

**IX. SENTENCING INSTRUCTIONS ERRONEOUS IN THAT THEY FAILED TO INFORM JURY THAT THEY NEED NOT BE UNANIMOUS IN FINDING MITIGATING CIRCUMSTANCES.**

**X. ERROR IN SUBMITTING "PRIOR VIOLENT FELONY" AGGRAVATOR TO JURY.**

**XI. DENIAL OF INSTRUCTIONS D-5, D-9, AND D-14 AND GRANTING OF STATE'S "SENTENCING INSTRUCTION 1" WAS ERROR UNDER STATE LAW AND EIGHTH AND FOURTEENTH AMENDMENTS.**

**XII. ERROR IN ADMITTING INTO EVIDENCE STATEMENT OF BERRY TAKEN IN VIOLATION OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS.**

**XIII. ERROR IN DENYING INDIVIDUAL SEQUESTERED VOIR DIRE.**

**XIV. CIRCUIT COURT VIOLATED SIXTH AND FOURTEENTH AMENDMENTS TO U.S. CONSTITUTION BY CHOOSING VENUE WHICH RESULTED IN SUBSTANTIAL REDUCTION OF PROPORTION OF AFRICAN-AMERICANS ON JURY VENIRE.**

**XV. ERROR IN EXCUSING A JUROR FOR CAUSE IN VIOLATION OF STATE LAW AND SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO U.S. CONSTITUTION.**

**XVI. DEATH PENALTY IS DISPROPORTIONATE PUNISHMENT HERE GIVEN THE CIRCUMSTANCES OF THE CRIME AND CHARACTER AND HISTORY OF DEFENDANT.**

**XVII. AGGREGATE ERROR IN THIS CASE REQUIRES BERRY'S DEATH SENTENCE BE VACATED.**

¶3. The following facts were delineated as set forth in ***Berry***:

Mary Bounds was reported missing around midnight, Sunday, November 29, 1987. Authorities located her automobile in Houston, near the Baptist Church. Blood was spattered around the driver's door of the car, and Mary Bound's earrings were found near the car Tuesday morning. Cecil Woodard, Jr., found a pair of woman's shoes by the side of a road Monday morning. On learning that a woman was missing, he directed authorities to the place where he found them. Nearby, authorities discovered Mary Bounds' body.

We know details of the murder only from Earl Berry's own statements, corroborated by the physical evidence. Earl Berry, after leaving a friend's apartment, drove through Houston, Mississippi, at approximately 7:00 p.m., Sunday, November 29, 1987. He saw Mary Bounds near the Baptist Church, and approached her. As Berry reached for her, she screamed, he hit her and forced her into his car, after which he left town.

The first time Berry stopped, he took Mary Bounds into the woods, lifted her over a fence, and ordered her to lie down, intent on raping her. For reasons unknown, he did not actually commit the rape, but took his victim back to his car, telling her they would return to town. Once in the car, Berry drove, not into town, but south and turned off once again into another wooded area. Mary Bounds begged, for what, Berry could not say. Berry beat her with his fist and forearm,

after which he carried her over a fence and deeper into the woods. At one point she was forced to the ground and he lay over her as a car approached. He carried her deeper into the woods, where he left her.

Berry drove south, eventually arriving at his grandmother's house, disposing of a mismatched pair of tennis shoes he was wearing on the way. On arrival he burned his bloodied clothes, then cleaned the blood from his car with a towel which he threw into the pond near the house.

A blue pajama top and dish towel were found in the pond behind Berry's house. Berry's knuckles were skinned when he was arrested. The mismatched tennis shoes were located with Berry's assistance. Mary Bounds' body bore wounds consistent with a beating, and her legs were badly scratched. She died of head injuries from blows.

*Berry,* 575 So. 2d at 4.

### I. LEGISLATIVE MANDATE AS TO WHAT FACTORS JUSTIFY IMPOSITION OF DEATH SENTENCE FLOUTED WHEN ARBITRARY FACTORS WERE RELIED ON TO ADVOCATE DEATH, VIOLATING BERRY'S RIGHTS UNDER STATE LAW AND EIGHTH AMENDMENT TO U.S. CONSTITUTION.

¶4. During trial the prosecutor called Gena Watson, Mary Bounds' daughter, as a witness. The prosecutor questioned Watson about some of the victim's personal characteristics and background. He asked Watson about her parents' marriage and their jobs. Later, he introduced into evidence a photograph of Mr. and Mrs. Bounds. The prosecutor went on to introduce photographs of Mrs. Bounds' car at the First Baptist Church in Houston, as well as, photographs of the church itself. He elicited from Watson how long her mother had been a member of the church and the activities in which she participated. Watson was asked to identify a pair of earrings and shoes as belonging to her mother and was also quizzed about visits her mother made to Ella Springer, Watson's grandmother.

¶5. Berry argues that this type of evidence is impermissible because it could result in the death sentence being imposed wholly for arbitrary reasons not related to the crime, in contravention of the Eighth and Fourteenth Amendments to the Constitution of the United States. *Furman v. Georgia*, 408 U.S. 238 (1972). He further advances this argument by claiming that Mississippi's sentencing scheme in capital cases comports with the *Furman* principle through the operation of this State's aggravating circumstances statute, Miss. Code Ann. § 99-19-101. According to Berry, aggravating circumstances allow a jury to select death row inmates in a regulated manner, thereby avoiding the arbitrary imposition of death sentences as prohibited by *Furman*; therefore, the State is limited to introducing evidence that is relevant only to the eight statutory aggravating circumstances of Miss. Code Ann. § 99-19-101(5).

¶6. In *Balfour v. State*, 598 So. 2d 731, 747-48 (Miss. 1992), and *Coleman v. State*, 378 So. 2d 640, 648 (Miss. 1979), we limited evidence in the sentencing phase of a capital case to that which is relevant to statutory aggravating circumstances under § 99-19-101(5). Despite this fact, the State contends that this evidence is fully permissible as victim character evidence and victim impact evidence under United States Supreme Court precedent and precedent of this Court. The State relies on *Payne v. Tennessee*, 501 U.S. 808 (1991); *Conner v. State*, 632 So. 2d 1239 (Miss. 1993), *cert. denied*, 513 U.S. 927 (1994); *Jenkins v. State*, 607 So 2d 1171 (Miss. 1992); and *Hansen v. State*,

592 So. 2d 114 (Miss. 1991), *cert. denied*, 504 U.S. 921 (1992),*post-conviction relief granted on other grounds*, 649 So. 2d 1256 (Miss. 1994), in support of its contention.

¶7. In *Payne*, the United States Supreme Court announced that the Eighth Amendment did not bar a State's choice to permit the admission of victim character and impact evidence, nor did it bar prosecutorial argument on those matters. *Payne*, 501 U.S. at 827. This Court, however, has been hesitant to embrace the full constitutional panoply afforded by *Payne*. Several of our recent cases reflect *Payne's* impact on our jurisprudence, albeit in a small way. In *Hansen*, which was decided shortly after *Payne* was handed down, we stated that *"Payne*, of course, is properly phrased in terms of the constitutionally permissible, not the mandatory, and in prudence, we should await another day to explore the full reach of our rediscovered freedom." *Hansen*, 592 So. 2d at 146-47. In light of *Hansen* and *Payne*, we later noted that victim character and impact evidence are proper when it is "necessary to a development of the case and [the] true characteristics of the victim and could not serve in any way to incite the jury." *Jenkins*, 607 So. 2d at 1183. *See also Mack v. State*, 650 So. 2d 1289, 1324-25 (Miss. 1994), *cert. denied*, 116 S. Ct. 214 (1995); *Evans v. State*, 422 So. 2d 737, 742 (Miss. 1982), *cert. denied*, 461 U.S. 939 (1983) (noting that an orderly and coherent sentencing hearing requires proof of the manner in which the homicide was committed, as well as, facts relevant to aggravating circumstances). Thus, Gena Watson's testimony is admissible if it is necessary to develop the case, and if it is relevant to any of the aggravating circumstances listed in Miss. Code Ann. § 99-19-101(5)(1994).

¶8. The evidence elicited about the Boundses' marriage appears to have minimal probative value; however, the State made no attempt to establish the impact of Mrs. Bounds' death upon her husband. When measured against the evidence as a whole, it is fair to say that this particular evidence was not so inflammatory that it prejudiced Berry. Similarly, some of the specific statements about Mrs. Bounds' church membership border on being relevant. Nevertheless, it should be recalled that Berry abducted Mrs. Bounds as she left church; therefore, under the circumstances of this abduction, the statements hardly appear prejudicial. Moreover, Berry must remember that he caused this particular situation; therefore, he cannot complain if the evidence has some probative value. *Evans*, 422 So. 2d at 743. On balance, it appears that Watson's testimony was necessary to develop the case and was relevant to the aggravating circumstance of kidnapping. Watson's testimony basically centered on the events surrounding the disappearance and kidnapping of her mother and included testimony concerning a few of Mary Bounds' personal characteristics. This evidence provided the jury with a proper perspective from which it could base its decision. In light of *Payne*, *Jenkins*, and *Hansen*, this claim has no merit.

¶9. Berry also argues that in closing its case, the prosecution seized upon this evidence to make impermissible arguments for imposing a death sentence. The prosecutor argued as follows:

> What he did is justice, mercy, and mitigation[?] He took [Gena] Watson's mother away from her. What mercy did Mrs. Bounds have? He took her away from her daughter. Where is the mercy and justice? She won't be getting to go by [sic] and see her mother now on 389. She worked 24 years at Seminole, the garment factory there in Houston, as quality control.

> What about her friends? Where is her mitigation or justice, her mercy, her work, enjoyment of this life?

> Where is the justice and mitigation and mercy of being a faithful member of the First Baptist Church, a member of the choir, taught Sunday [sic] School, there when the doors are open? I do good to get there on Sunday. I try to go every Sunday.
>
> This woman was there every time the doors were open, at night, Sunday night. She missed choir practice that night. No doubt about that.
>
> What about Charlie, her husband? Mary didn't get to enjoy the fruitful years of her life with him. He didn't with her. There is no justice, mitigation, and mercy there.

¶10. This argument may be error under our recent case law. *Mack*, 650 So. 2d at 1325. However, this error is waived because Berry failed to raise a contemporaneous objection on this basis during the State's closing argument. Berry did make objections on this basis during the prosecutor's direct examination of Watson, but he failed to object when the prosecutor organized these individual statements into an argument for the imposition of the death penalty. In *Mack*, the appellant's error was waived because he did not object "when the prosecutor marshalled individually innocuous facts into [his] argument" in such a way as to make the argument improper. *Id.* We also upheld the procedural bar in the capital case of *Pinkney v. State*, 538 So. 2d 329, 338 (Miss. 1988), *vacated on other grounds*, 494 U.S. 1075 (1990), when the appellant failed to object to statements, somewhat similar to those in the case sub judice, made in the prosecution's guilt phase opening argument. Accordingly, Berry's failure to contemporaneously object to the matter bars our review of the error on appeal. *Chase v. State*, 645 So. 2d 829, 859 (Miss. 1994), *cert. denied*, 515 U. S. 1123 (1995); *Carr v. State*, 655 So. 2d 824, 853 (Miss. 1995), *cert. denied*, 116 S. Ct. 782 (1996).

## II. ADMISSION OF UNRELIABLE AND IRRELEVANT EVIDENCE VIOLATED BERRY'S RIGHT TO A FAIR TRIAL.

### A. Fact that Berry was an Habitual Offender.

¶11. Berry was adjudicated an habitual offender in the guilt phase of his first trial in this matter. *Berry*, 575 So. 2d at 3. This adjudication meant that Berry would never be eligible for probation or parole. Nevertheless, during the sentencing phase of his first trial, the jury was never informed of this fact, and Berry was sentenced to death. On appeal, this death sentence was overturned because the jury was left to speculate as to whether or not Berry was eligible for parole or probation. In remanding that case for a new sentencing trial, we ordered the trial court to inform the new sentencing jury that Berry had been adjudged an habitual criminal. *Id.* at 14.

¶12. Berry now complains that the trial judge's reference to this fact in voir dire and in Jury Sentencing Instruction No. 1 infected his resentencing trial. He argues that these statements are inappropriate because they were made in contravention of *Coleman v. State*, 378 So. 2d 640 (Miss. 1979) and Miss. R. Evid. 404(b).

¶13. Berry failed to object to any of the trial judge's statements during voir dire. When the State submitted Jury Instruction No. 1, Berry also failed to specifically object to its habitual offender language. Failure to contemporaneously object waives any error. *See Mack*; *Chase*; and *Carr*. Berry is procedurally barred from this claim.

### B. Unnecessary and inflammatory photographs and video.

¶14. At trial, Berry objected to the admission of fifteen photographs of Mrs. Bounds' body and to one video. Eleven of these photographs were introduced into evidence during Berry's first trial. The other four photographs were made from slides that were also introduced in Berry's first trial. Berry claims that the photographs and video violated Miss. R. Evid. 402 and 403 because they were irrelevant and prejudicial, thereby depriving him of a fair trial. Berry also objected to the use of the photographs and video during the prosecution's closing argument.

### 1. During the Trial.

### a. The photographs.

¶15. The guidelines for admitting photographs is delineated in *McNeal v. State*, 551 So. 2d 151 (Miss. 1989). In *McNeal*, we stated the following:

> Previously, this Court has held that the admissibility of photographs rests within the sound discretion of the trial judge, whose decision will be upheld absent abuse of that discretion . . . . Yet, photographs which are gruesome or inflammatory and lack an evidentiary purpose are always inadmissible as evidence. *Cabello v. State*, 471 So. 2d 332, 341 (Miss. 1985); *Billiot v. State*, 454 So. 2d 445, 449-60 (Miss. 1984).

> [*McFee v. State*, 511 So. 2d 130, 135 (Miss. 1987)]. . . .

> [W]e do not presume to conclude that every gruesome photograph admitted into evidence constitutes an abuse of discretion; however, when presented with photographs such as the ones in this case, we caution the trial judge to carefully consider all the facts and circumstances surrounding the admission of this particular type of evidence. More specifically, the trial court must consider: (1) whether the proof is absolute or in doubt as to identity of the guilty party, as well as, (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury.

*McNeal*, 551 So. 2d at 159.

¶16. According to Berry, it was not necessary to admit all of the photographs to prove the existence of an aggravating circumstance.

¶17. We approved these photographs in *Berry I.* There we stated the following:

> Eleven photographs and slides of the victim were entered into evidence over the objection of the defendant. Berry argues that the probative value of these photos is outweighed by their prejudicial effect. *McNeal v. State*, 551 So. 2d 151 (Miss. 1989); *Kniep v. State*, 525 So. 2d 385, 388 (Miss. 1988); Miss. R. Evid. 403.

> Admissibility of photographs rests within the sound discretion of the trial judge. *Griffin v. State*, 557 So. 2d 542, 550 (Miss. 1990). We find this assignment is without merit. Having viewed the pictures, we find their probative value was not outweighed by their prejudicial effect.

*Berry*, 575 So. 2d at 9-10. We find no reason to depart from this decision.

¶18. Moreover, photographs can provide graphic proof of the statutory "heinous" aggravating circumstance found in Miss. Code Ann. § 99-19-101(5)(h). *Shell v. State*, 554 So. 2d 887, 902 (Miss. 1989), *rev'd on other grounds*, 498 U.S. 1 (1990). In *Shell*, five photographs of the victim's body were deemed admissible to show the atrocious nature of the crime. A review of the photographs admitted in this case likewise reveals that each one "gave evidentiary value to the aggravating circumstance of acts of an 'heinous, atrocious, and cruel' nature." *Id.* In sum, the photographs were quite probative as to the nature of the crime and not prejudicial; therefore, the trial court did not abuse its discretion when it admitted them into evidence.

### b. The video.

¶19. The admissibility of videotapes is considered under the same analysis as the admissibility of photographs. *See Holland v. State*, 587 So. 2d 848, 864-65 (Miss. 1991). Accordingly, we must determine if the probative value of the video outweighs any prejudicial effect it might cause. Our attention is focused on whether the photos are necessary evidence or merely an artifice used by the State to inflame the jury.

¶20. Basically, the video does not reveal more than was revealed by the still photos and physical evidence. The video contained pictures of the following: (1) the remote area where Mrs. Bounds' body was found; (2) the body of Mrs. Bounds as found by Investigator Billy Gore; (3) possible blood splatters on a nearby tree; (4) shoe tracks allegedly made by Berry; (5) Mrs. Bounds' shoes; (6) the west side of Houston First Baptist Church; (7) the scene where Berry's shoes were found; (8) a portion of Highway 15, which was part of the route Berry used during the kidnapping of Mrs. Bounds; and (9) the retrieval of rags Berry used for wiping up blood.

¶21. In *Holland*, we reviewed a situation similar to that in the instant case. There the trial court admitted into evidence a video recording that was duplicitous of photographic evidence. The admission of the video was held to be harmless error, however, since its content, along with other overwhelming and horrific evidence, rendered the video nonprejudicial. *Id.* at 864. The same can be said of the video in the case *sub judice*. The video pictures were no more gruesome than the still photographs introduced by the prosecution. The sound had been edited from the video, and it was not lengthy. The video also gave the Union County jury a frame of reference as to the Chickasaw County crime. On balance, it does not appear that the cumulative nature of this particular video would cause the jury to give undue credit to the heinous, atrocious, and cruel nature of this crime. As in *Holland*, we find the video's admission to be harmless.

### 2. During closing argument.

¶22. During closing argument the prosecution bolstered its case by showing the photographs and portions of the video to the jury over defense counsel's objection. The use of such visual aids can have no other effect than to inflame and prejudice the jury. *Stringer v. State*, 500 So. 2d 928, 935 (Miss. 1986). This Court deplores such prosecutorial conduct. *Id. See also Lanier v. State*, 533 So. 2d 473, 484 (Miss. 1988). The strong language used in *Stringer* and *Lanier* would seem to suggest that reversal is always required when such a tactic as this is used by the prosecution. This is not so. In *Stringer*, we held that "this tactic, **combined with others**, so prejudiced the jury that

Jimbo Stringer did not receive a fair sentencing trial." *Stringer*, 500 So. 2d at 935 (emphasis added). And in *Lanier*, the issue was not determinative because no contemporaneous objection was made at trial. *Lanier*, 533 So. 2d at 484. In the case *sub judice*, the prosecutorial conduct was not as egregious as that in *Stringer*. Given the wide latitude we accord attorneys in making their closing argument, we find that the showing of the photographs and video did not inflame the jury to the point that Berry did not receive a fair trial.

### III. EIGHTH AND FOURTEENTH AMENDMENTS TO U.S. CONSTITUTION AND ARTICLE 3, § 28 OF STATE CONSTITUTION PROHIBIT IMPOSITION OF DEATH PENALTY WHERE THE SYSTEM PERMITS THIS UNIQUE PENALTY TO BE APPLIED IN A WANTON AND FREAKISH MANNER.

¶23. It is Berry's position that Mississippi's sentencing system, as applied to killings in the course of kidnapping, violates the principles enunciated in *Furman v. Georgia*, 408 U.S. 238, (1972), and *Godfrey v. Georgia*, 446 U.S. 420 (1980), and thus is unconstitutional.

¶24. Berry was convicted for killing during the commission of a kidnapping under Miss. Code Ann. § 97-3-19(2)(e)(1994). That section states:

> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
>
> . . . .
>
> (e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies . . . .

¶25. According to Berry, upon proof of the exact same factual elements, he could have been convicted of manslaughter under Miss. Code Ann. § 97-3-27(1994), which reads as follows:

> The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony, except rape, burglary, arson, or robbery, or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.

Because these statutes overlap, Berry maintains that unfettered discretion is granted to the prosecutor in the choice of offenses to prosecute and/or the jury in the choice of offenses on which to convict, and this discretion is forbidden by *Furman.*

¶26. The State maintains that Berry is procedurally barred from raising this issue because he failed to make any objection on this basis at trial. As previously stated, failure to contemporaneously object to a matter at trial waives the error on appeal. *See Mack, Chase*; and *Carr*.

¶27. Without waiving any procedural bar, we find Berry's argument unpersuasive. *Furman* demands a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman*, 408 U.S. at 313 (White, J., concurring). And according to

*Godfrey*, death sentences cannot be imposed in an uncontrolled, standardless, and unchanneled manner. *Godfrey*, 446 U.S. at 428. It is clear that Mississippi's capital sentencing scheme comports with these mandates, and despite Berry's assertion to the contrary, the sentencing scheme safeguards against the wanton and freakish application of the death penalty.

¶28. A prosecutor's discretion as to what murders he can try as a capital offense is limited by Miss. Code Ann. § 97-3-19(1994). That statute enumerates the only murders which are punishable by death in Mississippi. Berry correctly asserts that "where there are two separate criminal statutes for the same offense, the State has a choice of deciding the statute under which to prosecute." *Butler v. State*, 608 So. 2d 314, 320 (Miss. 1992). Berry, however, fails to acknowledge that the prosecutor's choice is not absolute. We have repeatedly held that in capital cases that if the facts so warrant, a defendant's request for a manslaughter instruction must be given. *See Id.*; *Mackbee v. State*, 575 So. 2d 16, 22-23 (Miss. 1990); *Mease v. State*, 539 So. 2d 1324, 1329-30 (Miss. 1989). In Berry's prior appeal, the Court determined that he was not entitled to a lesser included offense instruction because no reasonable jury could have convicted him of manslaughter. *Berry*, 575 So. 2d at 11-12. The Fifth Circuit addressed a similar matter in *Cordova v. Lynaugh*, 838 F.2d 764 (5th Cir. 1988), *cert. denied*, 486 U.S. 1061(1988). In that case the Fifth Circuit held that Eighth Amendment and due process requirements are satisfied when a jury is allowed to consider a lesser included noncapital offense in capital cases where it could rationally acquit on the capital crime and convict on the noncapital crime. *Id.* at 767. Since Mississippi's sentencing scheme embraces this rule, Berry's argument is unfounded.

¶29. Mississippi's sentencing scheme further channels the imposition of the death penalty through the weighing of aggravating and mitigating circumstances as promulgated by Miss. Code Ann. § 99-19-101(3), (5), and (6)(1994). The weighing process itself is narrowed by adequately defining specific aggravating circumstances. *See Conner v. State*, 632 So. 2d 1239, 1270 (Miss. 1993), *cert. denied*, 513 U. S. 927(1994); *Jenkins v. State*, 607 So. 2d 1171, 1181-82 (Miss. 1992). Our sentencing scheme also statutorily encompasses the *Enmund* factors in order to prevent the indiscriminate imposition of the death penalty. Miss. Code Ann. § 99-19-101(7)(1994). *See Enmund v. Florida*, 458 U.S. 782 (1982) (holding that the Eighth Amendment does not permit the imposition of the death penalty unless the defendant actually kills, or attempts to kill, or intends that killing take place, or intends that lethal force will be employed). In light of all these safeguards, Berry's argument is not convincing; therefore, his sentence should not be vacated on this ground.

### IV. PROSECUTORIAL MISCONDUCT IN TRIAL OF THIS CASE VIOLATED BERRY'S RIGHTS UNDER FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO U.S. CONSTITUTION AND ARTICLE 3, §§ 14, 26, AND 28 OF STATE CONSTITUTION OF 1890.

### A. Use of theatrical performance in closing argument calculated to inflame jury.

¶30. Berry claims that during the State's closing argument the prosecutor improperly used a theatrical performance to inflame the jury by stomping around the victim's clothes which were lying on the courtroom floor. The transcript reads as follows:

> BY MR. LITTLE: But what did he do, he struck her and struck her and struck her. He stomped her.

BY MR. LEWIS: We would object to that and like the record to reflect he is stomping on the floor.

BY THE COURT: All right. Go ahead, Mr. Little.

The record does not reveal whether the clothes were displayed on the floor. At this point the prosecutor changed the focus of his argument and continued to address the jury.

¶31. Berry posits that since this Court requires verdicts to be based on reason and rules rather than emotion, the prosecutor's "theatrical demonstration" was improper. *Woodward v. State*, 533 So. 2d 418, 433(Miss. 1988), *cert. denied*, 490 U.S. 1028 (1989), *vacated on other grounds*, 635 So. 2d 805 (Miss. 1993); *Fuselier v. State*, 468 So. 2d 45, 53 (Miss. 1985). Berry also cites to *Griffin v. State*, 557 So. 2d 542 (Miss. 1990), where it was declared that:

> Attorneys are required to "act in a fit, dignified, and courteous manner which will not degrade or interfere with the administration of justice." Rule 5.01 UCRCCP. There is no need for an announcement by the district attorney that he intends to "stomp" his feet and "holler."

> So that there be no misunderstanding, this Court requires that all trials, civil and criminal, be conducted with dignity and decorum, and in an atmosphere of fundamental fairness in all respects and in every phase of the proceedings. All counsel are admonished that this Court is entitled to and demands their full, sincere, and whole-hearted cooperation to that end. Let it be finally and clearly understood that this Court will not suffer its requirements to be repeatedly disregarded with impunity.

*Id.* at 553-54.

¶32. Certainly the prosecutor's actions can be characterized as theatrical. The egregiousness of this demonstration, however, is difficult to ascertain from the record as reflected above. It appears that the stomping was brief and, to be sure, the prosecution was indeed arguing the facts of the case. More importantly, "[i]t is the rule in this State that where an objection is sustained, and no request is made that the jury be told to disregard the objectionable matter, there is no error." *Marks v. State*, 532 So. 2d 976, 981 (Miss. 1988) (*citing Simpson v. State*, 497 So. 2d 424, 431 (Miss. 1986); *Gardner v. State*, 455 So. 2d 796, 800 (Miss. 1984)). *See also Foster v. State*, 639 So. 2d 1263, 1282 (Miss. 1994), *cert. denied*, 514 U.S. 1019 (1995). The record reflects that Berry's counsel did not request the trial judge to admonish the jury concerning the prosecutor's actions. Nothing indicates that the prosecutor's demonstration was grossly overreaching. He did not dwell on this aspect of the case, but continued his argument by changing topics. In light of these facts, we find that Berry was not prejudiced by this demonstration.

**B. Prosecutor's reliance on Biblical law to support death penalty.**

¶33. Berry posits that the prosecutor improperly argued that the jury should use Biblical law to determine the punishment in this case. In his closing argument, the prosecutor told the jury that he had chosen to prosecute criminals under the death penalty because it was commanded by the law of Mississippi and by scripture. Berry failed to contemporaneously object to this Biblical reference; therefore, the matter is procedurally barred. *See Mack, Chase*; and *Carr*.

¶34. Later in his closing argument, the prosecutor used the Bible to show that Berry's psychological problems were not special because they have been around since Biblical times. In *Carr v. State*, 655 So. 2d 824 (Miss. 1995), *cert. denied*, 116 S. Ct. 782 (1996), we accepted the use of Biblical references in closing arguments. There the Court declared that

> [t]his Court has continually held that counsel is afforded broad latitude in closing argument. This latitude, set out by the Court in *Nelms & Blum Co. v. Fink*, 159 Miss. 372, 382-383, 131 So. 817, 820 (1930), has been referred to in the context of capital cases. In *Nelms*, we stated that "[c]ounsel may draw upon literature, history, science, religion, and philosophy for material for his argument." *Id*. at 382-384. *See Hansen v. State*, 592 So. 2d 114, 139-140 (Miss. 1991); *Shell v. State*, 554 So. 2d 887, 899 (Miss. 1989), *vacated on other grounds*, 498 U.S. 1, 111 S. Ct. 313, 112 L.Ed.2d 1 (1990); *Johnson v. State*, 416 So. 2d 383, 391 (Miss. 1982).

*Carr*, 655 So. 2d at 853.

¶35. In the instant case, the prosecutor used the Bible as an historical reference to illustrate his point to the jury. He did not use the reference to urge the imposition of the death penalty as Berry claims. Accordingly, Berry's claim is meritless.

### C. Prosecutor's argument that jury should return a death verdict for the people of Chickasaw County was improper.

¶36. The prosecutor concluded his closing argument by first stating the following:

> BY MR. GREGORY: What the State of Mississippi -- we're acting for the State of Mississippi, representative. I'm acting for Chickasaw County, and I'm proud to be from Chickasaw County. What we're asking you to do it's been authorized since the beginning of time as we have known it. Here it is now 1992.

According to Berry, this argument was improper because it effectively caused the jury to base its decision on public sentiment and "mob rule" rather than legal evidence; however, Berry failed to contemporaneously object to this statement at trial. Errors are waived if no contemporaneous objection is made. *See Mack, Chase* and *Carr*. This matter is procedurally barred.

¶37. Even if the procedural bar is relaxed, as was done in *Chase*, there is still no merit in Berry's position. In reading the prosecutor's statement, it is clear that he was referring to Mr. Little -- his co-counsel from Oxford, Mississippi -- when he made the remark about what "we're" asking you to do. He prefaced this statement by saying that "we're acting for the State of Mississippi." Thus, this statement did not command the jury to base its decision upon the expectations of the people of Chickasaw County.

### D. District attorney sought death penalty in this case for improper and arbitrary reasons.

¶38. In this assignment of error, Berry asserts that the prosecutor sought the death penalty because he (Berry) was offered a plea before the first trial but refused and later gained relief on appeal. Berry also claims that the death penalty was arbitrarily imposed, thus violating the mandates of *Furman v. Georgia*, 408 U.S. 238 (1972), and *Godfrey v. Georgia*, 446 U.S. 420 (1980), as well as, the Eighth

Amendment, since the district attorney offered guilty pleas and life sentences to other capital defendants who statutorily qualified for the death penalty.

¶39. The only proof Berry offers to this Court that the prosecutor sought the death penalty for his refusal to plead is found on page seven of the record. There we find that Berry's counsel had cited to the trial court two cases that he thought were more heinous than the one at bar; yet, in those cases the prosecutor had allowed the defendants to plead for life sentences. In response, the prosecutor stated his reasons for allowing the pleas, thus distinguishing the two cases from Berry's situation. He then noted that Berry had a significantly higher number of prior convictions than the other defendants and that Berry had been offered a plea as well. The fact that Berry did not accept the plea falls short of proving arbitrariness or discrimination on the part of the prosecutor.

¶40. Additionally, Berry apparently believes that since plea bargains are administered in an unchanneled and standardless fashion, the death penalty is freakishly imposed; however, he has presented no cases directly on point to support this proposition. *Furman* and *Godfrey* deal with the discretion of **judges and juries** to impose the death penalty. Furthermore, "[t]here is no constitutional right to plea bargain." *Allman v. State*, 571 So. 2d 244, 254 (Miss. 1990) (*citing Weatherford v. Bursey*, 429 U.S. 545, 561 (1977)). According to the United States Supreme Court, as long as the prosecutor acts

> [w]ithin the limits set by the legislature's constitutionally valid definition of chargeable offenses, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" so long as "the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."

*Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (*quoting Oyler v. Boles*, 368 U.S. 448, 456 (1962)).

¶41. Since Berry has not presented any evidence that the prosecutor offered plea bargains based upon some arbitrary classification, his claim must fail.

### E. Conclusion.

¶42. Berry concludes this assignment of error by asserting that these instances of prosecutorial misconduct, alone and/or in conjunction with one another, violated his rights under state law and the Eighth and Fourteenth Amendments to the United States Constitution. Having reviewed each of his allegations, we find no single or cumulative error warranting reversal of Berry's sentence. The prosecutor's conduct was not such that it deprived Berry of a fundamentally fair trial. *See Jenkins v. State*, 607 So. 2d 1171, 1183-84 (Miss. 1992); *Griffin v. State*, 557 So. 2d 542, 552-54 (Miss. 1990).

### V. AGGRAVATING CIRCUMSTANCE "THAT THE CAPITAL OFFENSE WAS ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL" WAS SUBMITTED TO THE JURY IN MANNER VIOLATIVE OF STATE LAW AND EIGHTH AND FOURTEENTH AMENDMENTS TO U.S. CONSTITUTION.

### A. Use of multiple "definitions" of term "especially heinous, atrocious, or cruel," in this

**Court's jurisprudence and in state courts generally, violates Eighth Amendment.**

¶43. The following jury instruction defined the aggravating circumstance of "heinous, atrocious or cruel":

> The Court instructs the jury as follows in considering whether the capital offense was especially heinous, atrocious or cruel; an especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of murders -- the consciousless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim then you may find this aggravating circumstance.

¶44. The first sentence of this instruction is the familiar *Spinkellink* limiting definition that has been approved by this Court and the United States Supreme Court. *See Clemons v. Mississippi*, 494 U.S. 738, 750 (1990); *Coleman v. State*, 378 So. 2d 640, 648 (Miss. 1979). *See also Spinkellink v. Wainwright*, 578 F.2d 582, 611 (5th Cir. 1978), *cert. denied*, 440 U.S. 976 (1979). The second sentence of this limiting definition contains the language suggested in *Pinkney v. State*, 538 So. 2d 329, 357 (Miss. 1988), *vacated on other grounds*, 494 U.S. 1075 (1990),[1] and later approved in *Conner v. State*, 632 So. 2d 1239, 1270-71 (Miss. 1993), *cert. denied*, 513 U.S. 927 (1994), and in *Jenkins v. State*, 607 So. 2d 1171, 1181-82 (Miss. 1992).

¶45. Thus, in the instant case, the State proffered a hybrid instruction defining "heinous, atrocious or cruel." Berry maintains that having multiple definitions of this aggravator permits the selection of condemned prisoners in an unprincipled way, in contravention of *Furman v. Georgia,* 408 U.S. 238 (1972). The gravamen of Berry's complaint is that aggravating circumstances must be consistently defined or the command of *Furman* will not be followed and sentencing decisions will be arbitrary and capricious. According to Berry, the United States Supreme Court reviews aggravating circumstances from a jurisdiction-wide perspective to determine if *Furman's* mandate of consistent and rational administration of capital punishment is satisfied. To support his argument Berry cites *Maynard v. Cartwright*, 486 U.S. 356 (1988), and *Lewis v. Jeffers*, 497 U.S. 764 (1990). It is from this point that Berry makes the quantum leap to his assertion that multiple definitions of "heinous, atrocious, or cruel" are constitutionally impermissible.

¶46. In *Cartwright*, the United States Supreme Court granted certiorari to review the "orderly and proper administration of state death-penalty statutes . . . ." *Cartwright*, 486 U.S. at 360. At issue was the affirmance by the Oklahoma Court of Criminal Appeals of Cartwright's death sentence under the "heinous, atrocious, or cruel" aggravator. Apparently, the Oklahoma court reviewed the facts of the case without requiring that any of the aggravating factors be present and thereby held:

> that a statutory provision governing a criminal case is unconstitutionally vague only if there are **no** circumstances that could be said with reasonable certainty to fall within reach of the language at issue. Or to put it another way, that if there are circumstances that any reasonable person would recognize as covered by the statute, it is not unconstitutionally vague even if the language would fail to give adequate notice that it covered other circumstances as well.

*Id*. at 361 (emphasis added).

¶47. The United States Supreme Court analyzed *Cartwright* according to its holding in *Godfrey v. Georgia*, 446 U.S. 420 (1980). In *Godfrey*, the United States Supreme Court reversed the Georgia Supreme Court's affirmance of the defendant's death sentence. The limiting language in Georgia allowed imposition of the death sentence "if the offense 'was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.'" *Cartwright*, 486 U.S. at 362. Apparently, the trial court based its decision only on the basis that the murder was "outrageously or wantonly vile, horrible or inhuman." The Supreme Court of Georgia found the decision to be "not objectionable" and affirmed the defendant's sentence without ruling on whether the facts of the case applied to the entire language of the statutory aggravator. According to the United States Supreme Court, reversal was warranted because the Georgia court had "failed to apply its previously recognized limiting construction of the aggravating circumstance." *Id.* at 363. Likewise in *Cartwright*, the Supreme Court opined that the decision of the Oklahoma court was indistinguishable from the Georgia court in *Godfrey*. *Id.* at 364. Despite the fact that the Oklahoma court found the events to adequately support the jury's finding, its action nonetheless "failed to cure the unfettered discretion of the jury and to satisfy the commands of the Eighth Amendment." *Id. Jeffers* reiterates this principle.

¶48. Berry's reliance on *Cartwright* and *Jeffers* is misplaced. These cases do not prohibit multiple definitions of aggravating circumstances; rather, they hold that appellate courts must review the "heinous, atrocious or cruel" aggravator consistent with their jurisdictions' constitutionally valid narrowing construction of that aggravator. As *Godfrey* declares, that narrowing construction must "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey*, 446 U.S. at 428.

¶49. The two limiting definitions to which Berry refers in the case *sub judice* have both been validated by this Court. In fact, *Jenkins* addressed a limiting instruction that also contained both definitions. *Jenkins*, 607 So. 2d at 1181-82. *See also Conner*, 632 So. 2d at 1270-71 (approving similar limiting instruction with both definitions). In *Jenkins*, it was held that the constitutionally valid language from *Clemons* and the unrejected language from *Pinkney* properly narrowed the "heinous, atrocious or cruel" aggravator. *Jenkins*, 607 So. 2d at 1182. As such, we hold that there is no merit to this assignment of error.

### B. Definition provided in Sentencing Instruction 3 violates Eighth Amendment.

¶50. Berry requests this Court to reconsider its holding in *Conner v. State*, 632 So. 2d 1239 (Miss. 1993), *cert. denied*, 513 U.S. 927 (1994), and *Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992). He bases his request on two United States Supreme Court cases that predate the ruling in *Conner*. Those cases are *Sochor v. Florida*, 504 U.S. 527 (1992), and *Espinosa v. Florida*, 505 U.S. 1079 (1992). A review of these cases reveals that there is no sufficient reason for us to revisit the issue.

### VI. SUBMISSION OF "MURDER IN THE COURSE OF A KIDNAPING" OR "FELONY MURDER" AGGRAVATING CIRCUMSTANCE VIOLATED STATE LAW, STATE CONSTITUTIONAL PROHIBITION AGAINST DOUBLE JEOPARDY, AND FEDERAL CONSTITUTIONAL PROHIBITIONS AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT.

¶51. Berry was convicted of capital murder under Miss. Code Ann. § 97-3-19(2)(e)(1994). That section of the statute reads as follows:

> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
>
> . . . .
>
> (e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies . . . .

¶52. One of the aggravating circumstances considered by the jury in Berry's sentencing trial was Miss. Code Ann. § 99-19-101(5)(d)(1994), which states the following:

> (5) Aggravating circumstances shall be limited to the following:
>
> . . . .
>
> (d) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, aircraft piracy, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, Mississippi Code of 1972, or the unlawful use or detonation of a bomb or explosive device.

¶53. Berry claims that this "felony murder" aggravating circumstance is constitutionally infirm, and he makes this claim for two reasons. First, the statute allowed the jury to use his kidnapping conviction as an aggravating circumstance. This aggravator, according to Berry, does not effectively limit the sentencer's discretion because "the sentencer fairly could conclude that [the] aggravating circumstance applies to every defendant" convicted of § 97-3-19(2)(e) capital murder. *Arave v. Creech*, 507 U.S. 463, 474 (1993). Second, the statute fails to genuinely narrow the class of persons eligible for the death penalty because an unintentional felony murder, standing alone, is not a crime for which the death penalty is a proportionate punishment. *Enmund v. Florida*, 458 U.S. 782 (1982). Since this aggravator is invalid, Berry argues that this Court must vacate his death sentence and remand his case for a new sentencing trial. *See Clemons v. State*, 593 So. 2d 1004 (Miss. 1992).

¶54. The State counters that Berry is procedurally barred from raising this issue because he failed to make a specific objection to the use of this aggravating factor. As previously stated, errors are waived if no contemporaneous objection is made. *See Mack, Chase* and *Carr*.

¶55. Without waiving the procedural bar, we find both of Berry's claims have no merit. Berry's first claim has been addressed by the United States Supreme Court in *Lowenfield v. Phelps*, 484 U.S. 231 (1988). In that case the United States Supreme Court stated:

> It seems clear to us from this discussion that the narrowing function required for a regime of

capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase. See also *Zant, supra,* 462 U.S. at 876, n.13, discussing *Jurek* and concluding: "[I]n Texas, aggravating and mitigating circumstances were not considered at the same stage of the criminal prosecution."

Here, the "narrowing function" was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that "the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more.

*Lowenfield*, 484 U.S. at 246. *See also Pinkney v. State*, 538 So. 2d 329, 358-59 (Miss. 1988), *vacated on other grounds*, 494 U.S. 1075 (1990) (rejecting claim identical to Berry's); *Byrne v. Butler*, 845 F.2d 501, 515 n.12 (5th Cir. 1988), *cert. denied*, 487 U.S. 1242 (1988).

¶56. Berry's jury executed the narrowing process when it found that he intended to kill and actually did kill Mary Bounds while contemplating that lethal force would be used in her murder. Hence, Berry's first claim is without merit.

¶57. Berry's second claim is founded on his argument that a defendant who commits an unintentional felony murder is less culpable than a defendant who commits a premeditated murder and is therefore less deserving of a death sentence. Since Miss. Code Ann. § 99-19-101(5)(d)(1994) does not require an intent to kill, Berry posits that the death penalty is a disproportionate punishment for his crime. In support of this argument, Berry chiefly relies upon *Enmund*. Berry, however, misreads *Enmund*; "it allows for the imposition of the death penalty where a defendant either kills, attempts to kill, intends to kill, or contemplates that lethal force will be used in a felony." *Gilliard v. Scroggy*, 847 F.2d 1141, 1147 (5th Cir. 1988), *cert. denied*, 488 U.S. 1019 (1989).

¶58. The United States Supreme Court elaborated on the scope of *Enmund's* "intent to kill" language in *Tison v. Arizona*, 481 U.S. 137 (1987). *Tison* concerned the imposition of the death penalty upon two defendants who were convicted of first-degree murder in connection with armed robbery, kidnapping, and theft of a motor vehicle. Neither defendant actually killed, nor specifically intended to kill, the victims. Speaking to the intent element and the measurement of culpability, Justice O'Connor stated the following:

[S]ome nonintentional murderers may be among the most dangerous and inhumane of all -- the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to

the moral sense as an "intent to kill."

. . . .

Only a small minority of those jurisdictions imposing capital punishment for felony murder have rejected the possibility of a capital sentence absent an intent to kill, and **we do not find this minority position constitutionally required. We will not attempt to precisely delineate the particular types of conduct and states of mind warranting imposition of the death penalty here.** Rather, we simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement.

*Id*. at 157-58 (emphasis added).

¶59. With this declaration in mind, we cannot say that Berry's culpability was such that the death penalty is a disproportionate punishment for his crime. In the final analysis, we note with great importance that the jury found beyond a reasonable doubt that Berry actually killed and intended to kill Mary Bounds, and that he contemplated that lethal force would be employed at the time of the commission of her murder as required by Miss. Code Ann. § 99-19-101(7)(1994) (codifying the *Enmund* factors). This finding is far more than sufficient to satisfy the *Enmund* culpability requirement; therefore, Berry's claim must fail.

### VII. ERROR IN LIMITING CONSIDERATION OF MENTAL CAPACITY TO "SUBSTANTIAL IMPAIRMENT" AND IN DENYING REQUESTED CHARGE ON STATUTORY MITIGATING CIRCUMSTANCE OF "MENTAL OR EMOTIONAL DISTURBANCE."

¶60. Over Berry's objection, the trial court instructed the jury that it could consider in mitigation whether "[t]he capacity of the Defendant, EARL WESLEY BERRY, to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Berry maintains that this instruction unconstitutionally limited the jury's consideration of his mental state because a rational juror might have concluded that for Berry's mental state to be a mitigating factor, some threshold of "substantial impairment" would have to be crossed. Berry additionally complains that the jury was precluded from fully considering his mental and emotional state since the judge refused to instruct the jury that they could consider as mitigation that "the offense was committed while Earl Berry was under the influence of mental or emotional disturbance." In support of his argument Berry cites *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); and *Penry v. Lynaugh*, 492 U.S. 302 (1989).

¶61. Berry's argument is unavailing as *Blystone v. Pennsylvania*, 494 U.S. 299 (1990), is dispositive of this issue. In *Blystone*, the petitioner claimed that his sentencing instructions "impermissibly precluded the jury's consideration of lesser degrees of [mental] disturbance, impairment, or duress[,]" because "the judge stated that the jury was allowed to consider whether petitioner was affected by an 'extreme' mental or emotional disturbance, whether petitioner was 'substantially' impaired from appreciating his conduct, or whether petitioner acted under 'extreme' duress." *Id*. at 308. The United States Supreme Court rejected this claim. Writing the Court's majority opinion, Chief Justice Rehnquist stated the following:

> The judge at petitioner's trial made clear to the jury that these were merely items it could consider, and that it was also entitled to consider "any other mitigating matter concerning the character or record of the defendant, or the circumstances of his offense." . . . This instruction fully complied with the requirements of *Lockett* and *Penry*.

*Id*. *See also People v. Cox*, 809 P.2d 351, 388 (Cal. 1991), *cert. denied*, 502 U.S. 1062 (1992).

¶62. Just as in *Blystone*, the jury in the case *sub judice* received a proper "catch-all" instruction. The "catch-all" instruction appeared as the second mitigating factor in Sentencing Instruction No. 1. That instruction reads as follows:

> If one or more of these aggravating circumstances is found to exist, then you must consider whether there are mitigating circumstances which outweigh the aggravating circumstances. Consider the following elements of mitigation in determining whether the death penalty should not be imposed.
>
> . . . .
>
> 2. Any other matter, any other aspect of the Defendant's character or record, and any other circumstance of the offense brought to you during the trial of this cause which you, the jury, deem to be mitigating on behalf of the Defendant.[(2)]

Berry's counsel exhaustively argued to the jury that they should not impose the death sentence due to the extenuating circumstances relating to Berry's mental and emotional state. When we take this fact into consideration with the "catch-all" instruction, we cannot conclude that the jury was unconstitutionally foreclosed from considering all mitigating circumstances. We accordingly find that this claim has no merit.

### VIII. ERROR IN REFUSING TO GIVE PEREMPTORY INSTRUCTIONS ON UNDISPUTED MITIGATING CIRCUMSTANCES.

¶63. Next, Berry contends that he was entitled to peremptory instructions as to the mitigating factors he presented at his sentencing trial. The following peremptory instructions were requested by Berry at the sentencing phase:

> The Court instructs you that you must find the following mitigating circumstance in this case:
>
> "Earl Wesley Berry committed the offense while he was under the influence of extreme mental or emotional disturbance."
>
> The Court instructs you that you must find the following mitigating circumstance in this case:
>
> "Earl Wesley Berry lacked the capacity to appreciate the criminality of his conduct or his ability to conform his conduct to the requirements of law was substantially impaired."

The trial court refused to give these instructions to the jury.

¶64. Berry argues that because the Mississippi Legislature has determined these factors to be mitigating,[(3)] and because there was no evidence to rebut the existence of these factors, he was

entitled to have the jury instructed that it **must find** these mitigating circumstances. Berry's claim is based on the testimony of Dr. Paul Blanton, a psychologist; Hope Stone, a social worker; and Dr. Lewis Tetlow, another psychologist.

¶65. This Court recently considered an identical claim in *Carr v. State*, 655 So. 2d 824 (Miss. 1995), *cert. denied*, 116 S. Ct. 782 (1996). There again, the standard for considering peremptory instructions was stated as follows:

> In determining whether a peremptory instruction should be granted and whether the verdict is contrary to the overwhelming weight of the evidence, the Court is required to accept as true all of the evidence favorable to the State, together with reasonable inferences arising therefrom, to disregard that evidence favorable to the defendant, and, if such evidence will support a verdict of guilty beyond a reasonable doubt, the peremptory instruction should be refused.

*Id*. at 855 (quoting *Wiley v. State*, 484 So. 2d 339, 349-50 (Miss. 1986), *cert. denied*, 479 U.S. 906 (1986), *overruled on other grounds by Willie v. State*, 585 So. 2d 660 (Miss. 1991)). Although the instructions in the instant case did not concern guilt, this standard may still be applied to the mitigating circumstances proffered by Berry. In applying this standard, we accept as true all of the evidence favorable to the State, along with reasonable inferences therefrom, and if such evidence could support a determination that Berry was not under the influence of extreme mental or emotional disturbance, or that Berry did not lack the capacity to appreciate the criminality of his conduct, or that Berry's ability to conform his conduct to the requirements of law was not substantially impaired, the refusal of the instructions was proper.

¶66. As in *Carr*, a careful examination of the record reveals "sufficient evidence that the mitigating factors should have been left for the jury's consideration." *Carr*, 655 So. 2d at 855. During cross-examination of Blanton, Stone, and Tetlow, the State elicited contradictory evidence about Berry's mental and emotional well-being. These contradictions left unanswered questions about the mitigating circumstances, as well as the witnesses' credibility. Because these questions could be answered only by the jury, the trial court properly refused the peremptory instructions. We therefore find no merit to this assignment of error.

### IX. SENTENCING INSTRUCTIONS ERRONEOUS IN THAT THEY FAILED TO INFORM JURY THAT THEY NEED NOT BE UNANIMOUS IN FINDING MITIGATING CIRCUMSTANCES.

¶67. Berry requested several instructions that would have informed the jury that they must determine the existence of mitigating factors on an individual basis. The trial court rejected these instructions, and Berry posits that the central sentencing instruction used by the trial court was erroneous since it did not require the jury to individually find mitigation. Berry argues that because the central sentencing instruction repeatedly referred to other findings that must be made unanimously by the jury, such as aggravating circumstances, the jury was left with the impression that it had to unanimously find the existence of a mitigating factor before it could be considered.

¶68. Berry's argument is founded on the holdings of *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990). In *Thorson v. State*, 653 So. 2d 876, 894 (Miss. 1994), this Court "addressed this argument under analogous instructions and found no error." In fact,

we have rejected this argument numerous times. ***See Chase v. State***, 645 So. 2d 829, 859-60 (Miss. 1994), ***cert. denied***, 515 U.S. 1123 (1995); ***Conner v. State***, 632 So. 2d 1239, 1271-73 (Miss. 1993), ***cert. denied***, 513 U.S. 927 (1994); ***Hansen v. State***, 592 So. 2d 114, 149-50 (Miss. 1991), ***cert. denied***, 504 U.S. 921 (1992), ***post-conviction relief granted on other grounds***, 649 So. 2d 1256 (Miss. 1994). In light of our past holdings, this claim has no merit.

## X. ERROR IN SUBMITTING "PRIOR VIOLENT FELONY" AGGRAVATOR TO JURY.

¶69. In this assignment of error, Berry asks us to reconsider a claim that we rejected in ***Berry I.*** Once again Berry maintains that the State should not have been allowed to use the "prior violent felony" aggravator. In ***Berry I*** we held:

> Berry argues that the aggravating circumstance, "previous conviction of a felony involving the use or threat of violence to the person" is invalid. The prosecution offered a certified copy of the judgment which was received as evidence without objection. The asserted reason for the invalidity is not that the underlying prior conviction was reversed or vacated, but that Berry was awarded damages in the amount of $15,000 as the result of a successful civil suit against the police officer who shot Berry. Despite these disturbing facts, the trial court cannot retry all prior convictions; thus, we have held the trial judge is not required to look beyond the prior conviction, valid on its face. ***Nixon v. State***, 533 So. 2d at 1099.

***Berry***, 575 So. 2d at 14.

¶70. Berry asserts no new reason to revisit this claim; therefore, we decline to reconsider the issue.

## XI. DENIAL OF INSTRUCTIONS D-5, D-9, AND D-14 AND GRANTING OF STATE'S "SENTENCING INSTRUCTION 1" WAS ERROR UNDER STATE LAW AND EIGHTH AND FOURTEENTH AMENDMENTS.

¶71. Berry claims that Sentencing Instruction 1 unconstitutionally shifted the State's burden to prove the existence of aggravating circumstances. Sentencing Instruction 1 informed the jury that they could impose the death penalty in the event they found that the mitigating circumstances did not outweigh or overcome the aggravating circumstances. In other words, a death sentence could not be rendered as long as the jury found that the mitigating circumstances outweighed or overcame the aggravating circumstances. Berry objected to this language and submitted to the trial court three sentencing instructions that would have informed the jury that there is a presumption of no aggravating circumstances until proved by a reasonable doubt and that aggravating circumstances must outweigh mitigating circumstances in order to impose a sentence of death. These instructions were refused by the trial court.

¶72. This issue was squarely addressed in the recently decided case of ***Davis v. State***, 660 So. 2d 1228 (Miss. 1995). In that case, we stated the following:

> Davis' argument here is two fold: (1) should the sentencing jury be instructed that there is a presumption that there are no aggravating circumstances until proved beyond a reasonable doubt?; and (2) should the sentencing jury be clearly instructed that aggravating circumstances

must outweigh mitigating circumstances in order to impose a sentence of death? Failure to instruct the jury accordingly, Davis argues, constitutes reversible error. Sentencing Instruction S-1 reads in relevant part:

You must unanimously find, beyond a reasonable doubt, that one or more of the preceding aggravating circumstance[s] exists in this case to return the death penalty. If none of these aggravating circumstances are found to exist, the death penalty may not be imposed, and you shall write the following verdict on a sheet of paper: . . . .

This part of Instruction S-1 informs the jurors that no aggravating circumstances exist unless the jury finds, beyond a reasonable doubt, that they exist. Accordingly, Davis' first contention is without merit.

Davis' second contention is foreclosed by this Court's recent decision in *Conner v. State*, 632 So. 2d 1239 (Miss. 1993), *cert. denied*, U.S. , 115 S. Ct. 314, 130 L.Ed.2d 276 (1994). Conner, like Davis, argued "that a proper instruction would permit imposition of the death penalty only where the jury finds that aggravating circumstances outweigh mitigating circumstances, not vice versa." *Conner*, 632 So. 2d at 1278. *See also Shell v. State*, 554 So. 2d 887, 904 (Miss. 1989), *rev'd on other grounds*, 498 U.S. 1, 111 S. Ct. 313, 112 L.Ed.2d 1 (1990); *Jordan v. State*, 365 So. 2d 1198, 1206 (Miss. 1978), *cert. denied*, 444 U.S. 885, 100 S. Ct. 175, 62 L.Ed.2d 114 (1979); *Gray v. Lucas*, 677 F.2d 1086, 1105-06 (5th Cir. 1982), *cert. denied*, 461 U.S. 910, 103 S. Ct. 1886, 76 L.Ed.2d 815 (1983). We rejected this argument in *Conner*, and today, we find no reason to vary from our holding in *Conner*. Accordingly, Davis merits no relief on this issue.

*Davis*, 660 So. 2d at 1245.

¶73. Sentencing Instruction 1 in Berry's case is practically identical to the instructions in *Davis* and *Conner* that we held to be without defect. Indeed, *Davis* declared as meritless the same issues as argued by Berry in this assignment of error. It follows then that Berry also merits no relief on this matter.

¶74. Berry also finds fault with the jury verdict form instruction. This instruction contained three options for the jury to use in returning their verdict. The jury could sentence Berry to death, sentence him to life in prison, or fail to unanimously agree on any punishment. All three options were on one page and were in that order. According to Berry, this form impermissibly emphasized the shifting of the State's burden of proof as it only provided a signature line for the jury foreman on the verdict accompanying the death sentence.

¶75. In the recent case of *Stewart v. State*, 662 So. 2d 552, 564 (Miss. 1995), we found that an instruction almost identical to Berry's might create confusion for a jury. The error did not warrant reversal in *Stewart* because we presumed that the jury followed the trial court's instructions. We so presume in this case. We again note that such a defect can be remedied by reversing the options in the sentencing instruction so that the life option appears first.

### XII. ERROR IN ADMITTING INTO EVIDENCE STATEMENT OF BERRY TAKEN IN VIOLATION OF HIS STATE AND CONSTITUTIONAL RIGHTS.

¶76. In **Berry I**, we held that the statement at issue sub judice was properly admitted into evidence. **Berry**, 575 So. 2d at 4-8. In Berry's resentencing trial the statement was introduced into evidence again. Berry now urges us to reconsider our decision in **Berry I** in light of our post-**Minnick** holding rendered in **Riddle v. State**, 580 So. 2d 1195 (Miss. 1991). In a sense, Berry is collaterally attacking his guilty verdict. A finding that his confession was inadmissible would certainly mandate the reversal of that verdict. However, such a reversal is not possible at this stage of the litigation as Berry cannot relitigate guilt at the appellate review of his resentencing trial. Accordingly, this claim is procedurally barred.

¶77. Even if this Court were to address the merits of Berry's claim, without waiving the procedural bar, we would find no error in the admission of his statement. According to Berry, application of the **Riddle** analysis would render his confession inadmissible. This might be so if the facts in **Riddle** were similar to the facts in Berry's case. But they are not. In **Riddle**, the defendant interrupted a custodial interrogation with a request to talk with his lawyer. After speaking with his attorney via a telephone, the interrogation continued. **Id.** at 1198-99. Berry, however, never spoke with his attorney. He instead waived his right to counsel.

¶78. We thoroughly analyzed this waiver in **Berry I.** There we deemed Berry's confession to be constitutionally acceptable under **Minnick** and a plethora of other cases. **Berry**, 575 So. 2d at 6-8. We ultimately concluded the following:

> We cannot find that the trial judge was manifestly wrong in his determination that the statement was freely and voluntarily given and we find, further, that Berry knowingly and intelligently waived the right to counsel, if he had previously invoked it. It is not the duty of the officers and prosecutors, nor the function of the courts, to insist that a person accused of a crime actually confer with a lawyer before talking about the crime, nor is there any prescribed procedure or form to be followed in the waiver of the right to such assistance.

**Id.** at 5-6. Since "the state established each fact which is prerequisite to the admissibility of the confession," we find no constitutional transgressions regarding Berry's statement. **Id.** at 8. We accordingly find no error in this matter.

### XIII. ERROR IN DENYING INDIVIDUAL SEQUESTERED VOIR DIRE.

¶79. The original venue for Berry's trial was the Circuit Court of Chickasaw County; however, upon motion of Berry's counsel, the trial was moved to the Circuit Court of Union County due to pretrial publicity. Prior to the change of venue, Berry moved for individual sequestered voir dire due to the content of pretrial publicity. The trial judge denied the motion and stated that he would consider individual sequestered voir dire as matters warranted. The trial judge reiterated this position after the trial was moved to Union County.

¶80. Berry argues that the trial court's failure to individually question each juror, who had been exposed to pretrial publicity, about their opinions on the case deprived him of the opportunity to determine if jurors were prejudiced by outside information. According to Berry, since potential jurors were questioned in the presence of the entire venire, he had no way to tell if they were impartial or just parroting the response of the individual next to them.

¶81. This Court recently rejected a similar claim in *Carr v. State*, 655 So. 2d 824, 842-43 (Miss. 1995), *cert. denied*, 116 S. Ct. 782 (1996). In *Carr*, we emphasized "the wide discretion trial courts enjoy in conducting voir dire with respect to the issue of pretrial publicity." *Id.* at 843 (*citing Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)). According to the United States Supreme Court, trial courts are not constitutionally required to ask jurors questions about the content of pretrial publicity to which they have been exposed. *Mu'Min*, 500 U.S. at 425. Constitutional rights are only implicated when "the trial court's failure to ask these questions . . . render[s] the defendant's trial fundamentally unfair." *Id.* at 425-26.

¶82. A thorough review of Berry's voir dire reveals no such constitutional infirmities. Venue had been changed to lessen any effect of pretrial publicity. The trial court questioned members of the venire who indicated they had some pretrial knowledge about the case. The questioning was not perfunctory. Individuals who indicated that they had some pretrial knowledge about the case were asked if they had formed an opinion as to what penalty should be imposed and whether they nonetheless could be impartial. Of the one hundred twenty-four venire members, only twelve said they had any knowledge about the case. Of those twelve members, only one was impaneled. Counsel for Berry further quizzed this individual about her impartiality and never requested that she -- or any other specific, potential juror -- be sequestered for additional questioning. The juror indicated that she could be fair and impartial and that she had not decided what punishment Berry should receive. From these facts, it is clear that the trial court did not abuse its discretion in denying Berry's request for individual sequestered voir dire; thus, we find no merit to this issue.

### XIV. CIRCUIT COURT VIOLATED SIXTH AND FOURTEENTH AMENDMENTS TO U.S. CONSTITUTION BY CHOOSING VENUE WHICH RESULTED IN SUBSTANTIAL REDUCTION OF PROPORTION OF AFRICAN-AMERICANS ON JURY VENIRE.

¶83. Berry requests this Court to "reconsider its position" in *Simon v. State*, 633 So. 2d 407 (Miss. 1993), *vacated on other grounds*, 513 U.S. 956 (1994), regarding venue changes to counties not having a similar racial makeup. According to Berry, Union County had a twenty per cent smaller population of black people than Chickasaw County; however, Berry never objected to moving the trial for this reason. Berry's only objection to changing venue to Union County was based on his worry that he had expended all of his goodwill in a prior trial in that county. His failure to object waives consideration of that matter on appellate review. *See Chase, Mack* and *Carr*. Since the trial court was never informed about this problem, there is no cause for this Court to revisit its holding in *Simon*.

### XV. ERROR IN EXCUSING A JUROR FOR CAUSE IN VIOLATION OF MISSISSIPPI LAW AND SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO U.S. CONSTITUTION.

¶84. Berry takes issue with the removal of juror Linda Hearn for cause. According to Berry, the trial court abused its discretion and committed reversible error when it struck her from the venire. The discussion concerning Hearn's removal discloses the following:

BY MR. LITTLE: Juror number 7, Ms. Hearn. Do you want the reason or just list them?

BY THE COURT: I think that that juror -- I don't think -- did y'all have any objection to that juror being excused?

BY MR. BELL: What's his reason?

BY MR. LEWIS: Looks like she's from another planet.

BY THE COURT: I don't know. It looks like she shouldn't be here. Do you have any objection to the Court excusing her for cause?

BY MR. BELL: Your Honor, nothing was ever developed during voir dire. We had not marked her as a for cause challenge.

BY THE COURT: Let's go ahead. I'll pass on her for right now. I'll come back to her in a minute.

. . . .

BY MR. LITTLE: May I reserve the right -- you took 7 under advisement.

BY THE COURT: Number what? That's what I was going to ask you about.

BY MR. LITTLE: Seven under advisement.

BY THE COURT: I'm going to excuse her. I know Mr. Bell and Mr. Lewis don't agree with that, but I'm going to excuse number seven. It's the Court's observation of her that the lady obviously has some problem and I don't know how to express it for the purposes of the record. She obviously has some disability that was never, she never responded [to] anything, but it was obvious to the Court that she is not capable of serving on the jury.

¶85. Excusing jurors for cause is in the complete discretion of the trial court. *Pierre v. State*, 607 So. 2d 43, 49 (Miss. 1992). "Generally, a juror removed on a challenge for cause is one against whom a cause for challenge exists that would likely affect his competency or his impartiality at trial." *Woodward v. State*, 533 So. 2d 418, 424 (Miss. 1988), *cert. denied*, 490 U.S. 1028 (1989), *vacated in part on other grounds*, 635 So. 2d 805 (Miss. 1993). In fact, this Court will reverse when a trial court fails to strike an incompetent juror. *Id.* Thus, this issue is reduced to whether or not the trial court abused its discretion in determining that Hearn was not competent to serve as a juror.

¶86. The trial court, with some difficulty, noted that Hearn had an obvious "disability" that would hinder her performance as a juror. Although the trial court was unable to precisely articulate the essence of this disability, Berry's counsel confirmed the trial court's doubt when Mr. Lewis stated that Hearn looked like she was from another planet. The trial court stated above that Hearn "never responded to anything"; however, this is inaccurate. Hearn, in fact, gave an inappropriate response to a question during voir dire.

¶87. The United States Supreme Court has stated that a trial court is entitled to deference when its for cause strikes are reviewed because of its ability to evaluate the demeanor of potential jurors, and reversal is not warranted where its findings are fairly supported by the record. *Wainwright v. Witt*, 469 U.S. 412 (1985). Naturally, mere conclusive statements about a potential juror's appearance

should not be indicative of their ability to serve in a trial. If something is so wrong with a potential juror that the trial court believes he or she is incompetent to carry out their oath, that fact should be articulable. In the instant case, the trial court stated in a somewhat conclusive manner that Hearn was incompetent to serve as a juror; nevertheless, reversal is not warranted. Here the defense counsel's own characterization of Hearn bolstered the trial court's vague expression concerning Hearn's "disability." Furthermore, Hearn's unsuitable response during voir dire undergirded the trial court's observation. We find no manifest abuse of the trial court's discretion. Accordingly, this assignment of error is without merit.

### XVI. DEATH PENALTY IS DISPROPORTIONATE PUNISHMENT HERE GIVEN CIRCUMSTANCES OF THE CRIME AND CHARACTER AND HISTORY OF DEFENDANT.

¶88. Berry posits that in *Edwards v. State*, 441 So. 2d 84, 93 (Miss. 1983), this Court found the death penalty disproportionate because the defendant suffered from paranoid schizophrenia. Consequently, Berry believes that his death sentence should be vacated since he is a paranoid schizophrenic functioning with brain damage and an impaired intellectual capacity.

¶89. *Edwards* is distinguishable and inapplicable for several reasons. First, "*Edwards* is of no precedential value to us since it represents a plurality vote." *Conner v. State*, 632 So. 2d 1239, 1265 (Miss. 1993), *cert. denied*, 513 U. S. 927 (1994). Indeed, we recently held that a diagnosis of paranoid schizophrenia does not necessarily prohibit the imposition of the death penalty where the defendant is competent to be executed. *See Billiot v. State*, 655 So. 2d 1, 17 (Miss. 1995), *cert. denied*, 116 S. Ct. 818 (1996). Expert testimony at Berry's trial revealed that he is indeed competent to be executed. *See Lowenfield v. Butler*, 843 F.2d 183, 187 (5th Cir. 1988), *cert. denied*, 485 U.S. 1014 (1988) (stating that for one to be competent to be executed he has to be aware of the punishment he is about to suffer and why he must suffer it).

¶90. *Edwards* is also distinguishable because the evidence of Edwards's affliction, unlike that in Berry's case, was "overwhelming, if indeed not without contradiction . . . ." *Edwards*, 441 So. 2d at 93. Edwards had been committed to the Mississippi State Hospital at Whitfield on two occasions and had a long history of hallucinations in which people were out to "get" or kill him. *Id.* at 87-88. Physicians had treated Edwards' condition for years with the drugs prolixin, cogentin, valium, and stelazine. *Id.* at 87. There is no evidence, on the other hand, that Berry had ever been diagnosed and/or treated, much less institutionalized, for his various afflictions prior to his killing Mary Bounds. There is also no evidence of Berry ever having suffered from any hallucinations.

¶91. Berry's I.Q. of 76 and his frontal lobe impairment afford him no relief either. According to Dr. Blanton, an I.Q. of 76 is in the borderline range of intellectual function and does not render one mentally retarded. In *Lanier v. State*, 533 So. 2d 473, 492 (Miss. 1988), the defendant had an I.Q. of 61 and suffered from hallucinations, yet we held that such disorders were not on the same level as those found in the *Edwards* case. The defendant, in *Neal v. State*, 451 So. 2d 743, 752 (Miss.1984), *cert. denied*, 469 U.S. 1098 (1984), *post-conviction relief granted in part on other grounds*, 525 So. 2d 1279 (Miss. 1987), had an I.Q. of 54 and suffered from the organic brain disorder dementia. This disease, which according to Dr. Blanton, is quite similar to Berry's frontal lobe impairment, affects a person's memory and ability to control his impulses. *Id.* Despite that fact, we held that Neal's

disturbances were not on par with those in ***Edwards***. ***Id***. at 762.

¶92. It appears then that Berry's mental state is more comparable to that of the defendants in ***Lanier*** and ***Neal*** than that of Hezekiah Edwards. As such, Berry's death sentence is not excessive or disproportionate in relation to other cases, and we reject this claim.

### XVII. AGGREGATE ERROR IN THIS CASE REQUIRES BERRY'S DEATH SENTENCE BE VACATED.

¶93. Berry contends that the accumulation of errors in his trial mandates the reversal of his conviction. ***Hansen v. State***, 592 So. 2d 114 (Miss. 1991), ***cert. denied***, 504 U.S. 921 (1992), ***post-conviction relief granted on other grounds***, 649 So. 2d 1256 (Miss. 1994); ***Stringer v. State***, 500 So. 2d 928 (Miss. 1986). We have scrutinized this case to determine the cumulative effect of any other errors or near errors made in this trial. The Court is divided on whether this cause should be remanded for a ***Batson*** hearing. Justice Pittman writes for the Court on this issue.

### Part Two:

### PITTMAN, JUSTICE, FOR THE COURT:

### XVIII. USE OF PEREMPTORY CHALLENGES IN A RACIALLY DISCRIMINATORY WAY IN VIOLATION OF FEDERAL AND STATE CONSTITUTIONS AND STATE LAW.

¶94. Berry asserts that during jury selection the prosecutor exercised two of its peremptory strikes in violation of ***Batson v. Kentucky***, 476 U.S. 79 (1986), and ***Powers v. Ohio***, 499 U.S. 400 (1991). Under ***Batson***, a challenge to a peremptory strike necessitates a three-step process. First, the defendant must establish a *prima facie* case of purposeful discrimination in the selection of jury members. To do this the defendant must show:

1. That he is a member of a "cognizable racial group";

2. That the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race; and

3. That facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities.

***Conerly v. State***, 544 So. 2d 1370, 1372 (Miss. 1989) (*citing **Batson***, 476 U.S. at 96-97; ***Lockett v. State***, 517 So. 2d 1346, 1349 (Miss. 1987), ***cert. denied***, 487 U.S. 1210 (1988)). Under ***Powers***, white defendants also have standing to challenge discriminatory peremptory strikes.

¶95. Second, should the defendant make such a showing, the striking party then has the burden to state a racially neutral explanation for the challenged strike. ***Batson***, 476 U.S. at 97-98. If a racially neutral explanation is offered the defendant can rebut the explanation. ***Bush v. State***, 585 So. 2d 1262, 1268 (Miss. 1991).

¶96. Finally, the trial court must make a finding of fact to determine if the defendant has proved purposeful discrimination. *Batson*, 476 U.S. at 98. If the defendant makes no rebuttal the trial judge must base his decision only on the reasons given by the State. *Bush*, 585 So. 2d at 1268. On appellate review this decision is accorded great deference, and we will reverse only when such decisions are clearly erroneous. *Lockett*, 517 So. 2d at 1349-50.

¶97. In the instant case, the prosecution struck every available black person from the venire except for the one left after it had exhausted all of its peremptory challenges. This resulted in a jury of eleven whites and one black. Such a jury composition certainly creates an inference of purposeful discrimination. *See Conerly*, 544 So. 2d at 1372 ("[T]he fact that the prosecution used all of the peremptory strikes necessary (five) to remove all but one black person from the jury satisfies the requirement of raising an inference of racial discrimination.").

¶98. Upon Berry's challenge to the strikes of African-American jurors, the trial court allowed the State to offer racially neutral reasons for doing so. Neither the trial judge, district attorney, nor Berry's counsel appeared to be aware of the *Powers* decision which the U.S. Supreme Court had handed down some fourteen months earlier. Nor did they appear to be aware of this Court's first discussion of *Powers* some nine months earlier in *Bush v. State*, 585 So. 2d 1262 (Miss. 1991). Berry failed to rebut the State's tendered racially neutral reasons for striking certain jurors. Since Berry is white, the trial judge thus ruled that *Batson* was inapplicable and allowed the strikes to stand. The trial judge's failure to apply *Powers*, of course, was error.

¶99. "When a *Batson* issue arises, the trial judge acts as the finder of fact. A reviewing court may not substitute its judgment for that of the trial judge, if there is sufficient evidence to support the judge's findings." *Turner v. State*, 861 S.W.2d 36, 39 (Tex Ct. App.1993). The race neutral explanations must be viewed in the light most favorable to the trial court's findings. *Id*. In the case *sub judice,* there was no finding of fact by the trial judge. He erred in stating that *Batson* did not apply in a *Powers* scenario.

¶100. Moreover, since the judge did not hold a *Batson* hearing we cannot review his discretion to determine whether he abused it as the standard of review requires. Nine years ago this Court held that where a case had no reversible error other than a *Batson* violation without a *Batson* hearing, the proper remedy is to remand the case for a *Batson* hearing. If the lower court finds discrimination, then a new trial is ordered. If there is no evidence of discrimination, the cause is certified to this Court along with the record of the hearing and the finding of the court below. *See Williams v. State*, 507 So. 2d 50, 53-54 (Miss. 1987). Since that time we have continuously approved of this remedy. *Bush v. State*, 585 So. 2d 1262, 1268 (Miss. 1991); *Abram v. State*, 523 So. 2d 1018, 1019 (Miss. 1988); *Dedeaux v. State*, 519 So. 2d 886, 891 (Miss. 1988); *Joseph v. State*, 516 So. 2d 505, 505 (Miss. 1987); and *Harper v. State*, 510 So. 2d 530, 532 (Miss. 1987). Even as recently as nineteen months ago, we again said that when there is no reversible error other than a *Batson* violation without a hearing, the proper remedy is to remand to the lower court for a *Batson* hearing. *Thorson v. State*, 653 So. 2d 876, 879-80 (Miss. 1994).

¶101. There is no reason why we should abandon the precedent set by this Court. There is no question that this case falls squarely under the line of cases cited above. The proper remedy is to remand for a *Batson* hearing.

## CONCLUSION

¶102. We have thoroughly reviewed the record of this case and have analyzed each assignment of error with great care. The only reversible error present was the lower court's refusal to find a ***Batson*** violation in a ***Powers*** scenario. Therefore, the proper course is to remand this cause to the circuit court solely for a ***Batson*** hearing. ***Thorson v. State***, 653 So. 2d 876 (Miss. 1994).

¶103. Accordingly, this cause is remanded to the circuit court of Chickasaw County to conduct a hearing on whether the ***Batson*** criteria were violated by the prosecution in exercising its peremptory challenges. The district attorney will be given an opportunity to come forward with neutral, non-race based ***Batson***-conforming explanations for each of the peremptory challenges he used on all the blacks excused. Berry in turn will be afforded the opportunity to challenge and rebut any such explanations. If the circuit court should thereafter find purposeful discrimination in violation of ***Batson***, it should order a new trial. On the other hand, should no impermissible discrimination be found, the circuit court should by opinion and order make its factual findings and certify the same to this Court.

¶104. **REMANDED TO THE CIRCUIT COURT OF CHICKASAW COUNTY TO CONDUCT A BATSON HEARING; AFFIRMED ON ALL REMAINING ISSUES.**

**PART ONE: MILLS, J., LEE, C.J., SULLIVAN, P.J., PITTMAN, BANKS, ROBERTS AND SMITH, JJ., CONCUR. PRATHER, P.J., CONCURS IN PART.**

**PART TWO: PITTMAN, J., PRATHER AND SULLIVAN, P.JJ., AND BANKS, J., CONCUR. McRAE, J., CONCURS IN RESULT ONLY.**

**MILLS, J., DISSENTS TO PART TWO WITH SEPARATE WRITTEN OPINION JOINED BY LEE, C.J., ROBERTS AND SMITH, JJ.**


**MILLS, JUSTICE, DISSENTING AS TO PART TWO:**



¶105. I respectfully dissent from the majority analysis in Part Two of this opinion regarding the use of peremptory challenges in this case. Earl Wesley Berry has twice received the death penalty in this case. His guilt is without question and another remand of this case will only serve to further frustrate the ends of justice. This Court possesses the authority to balance the ***Batson*** issues and such analysis should be carried out now as follows herein below.

¶106. Berry asserts that during jury selection the prosecutor exercised two of its peremptory strikes in violation of ***Batson v. Kentucky***, 476 U.S. 79 (1986), and ***Powers v. Ohio***, 499 U.S. 400 (1991). Under ***Batson***, a challenge to a peremptory strike necessitates a three-step process. First, the defendant must establish a *prima facie* case of purposeful discrimination in the selection of jury members. To do this the defendant must show:

    1. That he is a member of a "cognizable racial group";

2. That the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race; and

3. That facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities.

*Conerly v. State*, 544 So. 2d 1370, 1372 (Miss. 1989) (*citing Batson*, 476 U.S. at 96-97; *Lockett v. State*, 517 So. 2d 1346, 1349 (Miss. 1987), *cert. denied*, 487 U.S. 1210 (1988)). Under *Powers*, white defendants also have standing to challenge discriminatory peremptory strikes.

¶107. Second, should the defendant make such a showing, the striking party then has the burden to state a racially neutral explanation for the challenged strike. *Batson*, 476 U.S. at 97-98. If a racially neutral explanation is offered the defendant can rebut the explanation. *Bush v. State*, 585 So. 2d 1262, 1268 (Miss. 1991).

¶108. Finally, the trial court must make a finding of fact to determine if the defendant has proved purposeful discrimination. *Batson*, 476 U.S. at 98. If the defendant makes no rebuttal the trial judge must base his decision only on the reasons given by the State. *Bush*, 585 So. 2d at 1268. On appellate review this decision is accorded great deference, and we will reverse only when such decisions are clearly erroneous. *Lockett*, 517 So. 2d at 1349-50.

¶109. In the instant case, the prosecution struck every available black person from the venire except for the one left after it had exhausted all of its peremptory challenges. This resulted in a jury of eleven whites and one black. Such a jury composition certainly creates an inference of purposeful discrimination. *See Conerly*, 544 So. 2d at 1372 ("[T]he fact that the prosecution used all of the peremptory strikes necessary (five) to remove all but one black person from the jury satisfies the requirement of raising an inference of racial discrimination.").

¶110. Upon Berry's challenge to the strikes of African-American jurors, the trial court allowed the State to offer racially neutral reasons for doing so. Neither the trial judge, district attorney, nor Berry's counsel appeared to be aware of the *Powers* decision which the U.S. Supreme Court had handed down some fourteen months earlier. Nor did they appear to be aware of this Court's first discussion of *Powers* some nine months earlier in *Bush v. State*, 585 So. 2d 1262 (Miss. 1991). Berry failed to rebut the State's tendered racially neutral reasons for striking certain jurors. Given the opportunity, he clearly should have rebutted the "prosecutorial explanations, if he is able to do so." *Chisolm v. State*, 529 So. 2d 635, 638 (Miss. 1988). Since Berry is white, the trial judge thus ruled that *Batson* was inapplicable and allowed the strikes to stand.

¶111. The trial judge's failure to apply *Powers*, of course, was error. However, as both the State and Berry claim in their briefs, in spite of the trial judge's failure to determine the question of purposeful discrimination, the record on this issue is sufficient for this Court to decide the validity of the race neutral reasons cited by the State. If the defendant makes no rebuttal, the trial judge must base his decision only on the reasons given by the State. *Bush*, 585 So. 2d at 1268. The defense attorney had an opportunity to, at the least, rebut the reasons stated by the prosecution. He chose not to do so. The prosecutor *had* stated valid reasons -- ones recognized by this Court -- for such peremptory strikes.

¶112. ***Batson*** did not create a new right. Rather, "***Batson*** formulated a new evidentiary standard which the defendant must meet in order to prove his case on discrimination." ***State v. Chavis***, 542 So. 2d 181, 185 (La. Ct. App. 1989). Even "[b]efore ***Batson***, it was unconstitutional for the state to purposefully exclude one race from being members of a jury." ***Id***. Both parties admit that the record is sufficient on this issue which would allow this Court to undertake review of whether this defendant's rights were constitutionally protected. "[H]armless-error review has become an integral component of our criminal justice system." ***Sullivan v. Louisiana***, 508 U.S. 275, 284 (1993) (Rehnquist, C.J., concurring).

¶113. "Some constitutional violations, however, by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." ***Satterwhite v. Texas***, 486 U.S. 249, 256 (1988). An example of such violation that would fall into this category would be deprivation of counsel throughout the entire proceeding. ***Id***. "In the normal case where a harmless-error rule is applied, ... the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that error materially affected the deliberations of the jury." ***Id***. (*quoting **Holloway v. Arkansas***, 435 U.S. 475, 490 (1978)).

¶114. Other boundaries are observed in reviewing for harmless error. "Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard..." ***Chapman v. California***, 386 U. S. 18, 24 (1967).

¶115. The fact that there is no on-the-record factual determination by the trial court of the merits of the reasons cited by the State for its use of peremptory challenges against potential jurors is of no account in the case *sub judice*. ***Hatten v. State***, 628 So. 2d 294 (Miss. 1993), the case that prospectively required such a determination, was not handed down until after the resentencing trial of Berry. Therefore, it is not applicable to the case *sub judice*.

¶116. "When a ***Batson*** issue arises, the trial judge acts as the finder of fact. A reviewing court may not substitute its judgment for that of the trial judge, if there is sufficient evidence to support the judge's findings." ***Turner v. State***, 861 S.W.2d 36, 39 (Tex Ct. App.1993). The race neutral explanations must be viewed in the light most favorable to the trial court's findings. ***Id***. In the case *sub judice,* there was no finding of fact by the trial judge. He erred in stating that ***Batson*** did not apply in a ***Powers*** scenario. However, in allowing the challenged jurors to serve, the judge made a *de facto* ruling that the defendant's constitutional rights were not being violated. Reversal is only allowable if the defendant's constitutional rights were violated. Therefore, this Court should review the proceedings in the lower court under the harmless error standard and determine if the defendant's constitutional rights were violated. As there is no valid reason why this Court should not proceed on the record now before us and finish what the trial court started, we should decide the question of the validity of the State's strikes.

¶117. Berry argues now before this Court that the reason he failed to rebut the State's race neutral reasons for striking certain jurors was that he was cut off by the trial judge. The record simply does not support that claim. The trial judge, directly addressing Berry's counsel, stated:

BY THE COURT: That requires me, as I recall it, that he has to be a member of a recognizable

minority; that there has to be a showing of pattern of strikes by the prosecution against the members of that racial minority; and [Counsel}, I've given you an opportunity; and I want to give you an opportunity to develop whatever you want to develop on it. . . . I want to give you an opportunity if you have anything else.

BY MR. BELL: I don't have anything more to add.

The record clearly reveals that Berry's counsel offered absolutely nothing in rebuttal to the State's racially neutral explanations for its peremptory strikes. Although unaware of *Powers*, the trial judge, district attorney and defense counsel were all certainly aware of *Batson*. Berry challenged the strikes and the trial judge allowed the State to offer racially neutral reasons. They were thus in the middle of a *Batson* hearing which was not concluded. This Court should conclude this issue by examining the State's strikes of the two challenged jurors under a harmless error analysis.

¶118. Berry objects to the State's striking of juror Sarah Mosley. Berry now argues that two white jurors similarly situated to Mosley were not challenged. Question 22 on the juror information card read as follows: "Have you ever heard of Earl Berry?" Mosley responded, "Yes." The remaining portion of the question stated: "Please describe here what you know of him." Mosley responded, "Nothing nabor [sic]." The fact that Mosley was a neighbor of Berry is certainly an appropriate race-neutral reason for peremptorily striking a juror, as recognized by this Court in *Perry v. State*, 637 So. 2d 871, 874 (Miss. 1994) (Banks, J.). Therefore, allowing the State's strike of juror Mosley was harmless beyond a reasonable doubt.

¶119. Berry also takes issue with the State's striking of Lore Stubbs. The State claimed that Stubbs fell asleep twice during voir dire. Berry failed to contemporaneously object to the prosecution's assertion. Defense counsel merely stated that he did not see it. In *Mack*, the prosecution had alleged juror Lillie Terrell was "asleep during the court's voir dire, was extremely bored, was looking around, was yawning, put her head down, started fiddling around in her lap, was wearing short pants, and was thirty-nine years old and unemployed." *Mack*, 650 So. 2d at 1299. This Court held, "Inattentiveness, boredom, dress, demeanor, unemployment, and sleeping during voir dire have all been determined by this Court to be racially neutral reasons." *Id*. at 1299. *See Griffin v. State*, 607 So. 2d 1197, 1203 (Miss. 1992). *See also, Hatten*, 628 So. 2d at 297 (Smith, J.); *Abram v. State*, 606 So. 2d 1015, 1036 (Miss. 1992) (Sullivan, J.).

¶120. In addition to alleging Stubbs was sleeping, the State also offered other reasons for striking her. The State was concerned that because of her listed religious preference on question 14 on the juror information card that Stubbs "would not be in favor of the death penalty." Admittedly, this reason appears suspect and should be considered pre-textual when considering application of harmless error to this issue. The State was also concerned because Stubbs was a diabetic. Stubbs had informed the trial judge of her medical condition. She told the judge that she had to eat at regular meal times and take her medication. The trial judge said that her medication needs would be accommodated, but failed to address her concerns about having to eat at regular meal times. The prosecutor had a valid reason to be concerned about seating a person in need of regulated medical care on the jury, especially since the court did not make provisions for her need to eat at specific times. Certainly this reason would appear to be non-pretextual. Thus, the striking of juror Stubbs was harmless beyond a reasonable doubt.

**LEE, C.J., ROBERTS AND SMITH, JJ., JOIN THIS OPINION.**

1. Pinkney's conviction was vacated in ***Pinkney v. Mississippi***, 494 U.S. 1075 (1990); however, the suggested limiting language was not addressed by the United States Supreme Court.

2. "The use of such non-limiting 'any other mitigating circumstances' instructions has been approved by this Court in ***Gray v. State***, 375 So. 2d 994, 1003-1004 (Miss. 1979) (approving instruction that jury was to consider as a mitigating circumstance '[a]ny other matter [besides the statutory mitigating circumstances] brought before you which you may deem to be mitigating on behalf of the defendant') ." ***Neal v. State***, 451 So. 2d 743, 761 n.11 (Miss. 1984), ***cert. denied***, 469 U.S. 1098 (1984), ***post-conviction relief granted in part on other grounds***, 525 So. 2d 1279 (Miss. 1987). ***See also Carr v. State***, 655 So. 2d 824, 854-55 (Miss. 1995), ***cert. denied***, 116 S. Ct. 782 (1996).

3. Miss. Code Ann. § 99-19-101(6)(b), (f)(1994).